**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | No. CR-17-8163-PHX-DGC (JZB) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Martin Takatsy,<br>Ariane Gagnon, | |
| Defendants. | |

TO THE HONORABLE DAVID G. CAMPBELL, UNITED STATES DISTRICT JUDGE:

On February 22, 2018, the matter was referred to this Court for "hearing and recommendation" regarding Defendants' Motion to Suppress (doc. 43). (Doc. 56.) The Court recommends that the Motion to Suppress be denied.

**I.     Procedural Background.**

Pending before the Court is Defendant's Takatsy's Motion to Suppress. (Doc. 43.) Defendant Gagnon joined in the Motion and Responses. (Docs. 49, 75.) The government filed Responses (docs. 50, 53) and Defendants Replied (doc. 51). The parties filed supplemental memoranda. (Docs. 72, 74.) The Court conducted an evidentiary hearing on March 8 and March 30, 2018. (Docs. 65, 80.) On April 11, 2018, the parties submitted additional memoranda with the permission of the Court. (Docs. 84, 85.)

**II.     Findings of Fact.**

The Court submits the following findings of fact.

**A.**     **Special Agent Chris Foster.**

**1.**     **Testimony of March 8, 2018.**

Homeland Security Investigations ("HSI") Senior Special Agent Chris Foster began investigating Defendants because a DEA Special Agent informed him of a 92 kilogram cocaine seizure from a vehicle driven by Ronald Bannon on February 7, 2017. (Doc. 73 at 12; Doc. 50-1 at 35.) Agent Foster learned that on February 3, 2017, Bannon and Defendant Takatsy had traveled together from Montreal, Canada to Los Angeles, on the same itinerary check, each using one-way tickets. (Doc. 73 at 13, 17, 23.) After arriving at the airport in Los Angeles, Bannon rented a minivan and used Takatsy's phone number as the contact number. (*Id.* at 13-14.) The rental vehicle was set for return in Plattsburgh, New York on February 7, 2017. Takatsy and Bannon then traveled together in the rental vehicle to Las Vegas, where Takatsy paid for Bannon's room reservation at the Wynn Hotel. (*Id.* at 13-14.) Subsequently, Takatsy flew back to Canada (*id.* at 15), and Bannon drove to Arizona where he was stopped and 92-kilograms of cocaine were seized (*id.* at 12, 15).

On May 27, 2017, Takatsy and Gagnon returned to Las Vegas, Nevada. (*Id.* at 52-53.) Once there, Defendant Gagnon rented a minivan that was the same make and model as the minivan Bannon rented in February, and her rental was also destined for return in Plattsburgh, New York. (*Id.* at 21-22.) On May 31, 2017, Gagnon flew back to Canada. (*Id.*) On June 4, 2017, Takatsy returned the rental car in Las Vegas, and then flew back to Canada. (*Id*; Ex 8 at Bates 276.)

On July 5, 2017, Takatsy and Gagnon flew together from Montreal, Canada to Los Angeles, California. (*Id.* at 23.) After arriving in Los Angeles, Gagnon rented a Chrysler Pacifica minivan (the "Defendants' Vehicle") that was destined for return in Plattsburgh, New York on July 11, 2017. (*Id.* at 27.)[1] Defendants drove the Vehicle to a hotel in Santa

---

[1] Exhibit 11 contains a copy of the rental agreement. Agent Foster testified that "vans are used by drug-trafficking organizations to throw off interdictors based on the association to families and based on the available cargo space within the vehicle." *Id.* at 28.)

Monica, California. (*Id*. at 28.) That same day, at approximately 8:00 p.m. while Defendants' Vehicle was at the hotel, Agent Foster telephonically obtained a search warrant authorizing the placement of a tracking device on Defendants' Vehicle from California Superior Court Judge John Torribio. (*Id*. at 31.) Agent Foster verbally provided to Judge Torribio the facts contained in Exhibit 8. (*Id*. at 31, 33.)[2] Once Judge Torribio authorized placement of a tracking device on Defendants' Vehicle, a tracking device was placed on Defendants' Vehicle. (*Id*. at 36.)[3] The next day, Defendants' Vehicle left Santa Monica and drove to Las Vegas, Nevada. (*Id*.) Defendants stayed in Las Vegas on the night of July 6, 2017.

On July 7, 2017, agents learned the Defendants' vehicle departed Las Vegas and drove northeast on Interstate 15. Agent Foster then sought the assistance of agents in Utah. Because Interstate 15 crosses through the northwestern corner of Arizona, the Utah agents contacted Arizona Department of Public Safety Officer Tom Callister to assist with a potential traffic stop of the vehicle. (*Id*. at 38.)[4] Officer Callister was instructed to stop the vehicle if he saw a traffic violation but was not ordered to search the vehicle. (*Id*. at 38, 44.)

### 2. Testimony of March 29, 2018.

Agent Foster stated he was aware that California and Federal Rules require the taping of telephonic search warrants. (Doc. 86 at 9.) He read the probable cause statement

---

[2] Agent Foster does not believe the telephonic warrant conversation was recorded. (*Id*. at 35.)

[3] The Court finds, based upon the testimony of Agents Foster and Garland, and the text messages in Exhibits 22 and 23, that the dates written on the California warrant are a mere calendar error. The signed search warrant states that the telephonic warrant was obtained on July 6, and the in-person warrant was signed on July 7. But Agents Foster and Garland testified that the telephonic warrant was authorized on July 5, and then signed on July 6. (*Id*. at 32, 89.) Notably, Agent Garland testified that he could not be present for the signing of a warrant on July 7 because he was engaged in a search warrant that entire day. (*Id*. at 89.) The Court finds the testimony and evidence on this point credibly establish that Judge Torribio verbally authorized the tracking device on July 5, and signed a warrant on July 6. It is undisputed the tracking device was placed on the Defendants' vehicle on July 5, 2017.

[4] Ultimately, eight different agents and officers were included on a text message string that is identified as Exhibit 22. (*Id*. at 39.)

from Exhibit 8, Bates # 274-276 to Judge Torribio. (*Id*. at 11.) Agent Foster spoke with Arizona DPS Officer Tom Callister and "gave him a general understanding of the facts," which included a summary of the investigation. (*Id*. at 22.)[5] Agent Foster stated that Plattsburgh, New York "is often associated with narcotics trafficking as well as the normal commuting public." (*Id*. at 25.)

On re-direct examination, Agent Foster testified regarding a cell phone tracking warrant that was issued by Judge Hatch of the Coconino County Superior Court. (*See* Exhibit 24.)[6] The tracking warrant directed that location (or "ping") information regarding Takatsy's phone location be emailed in real time to law enforcement. (*Id*. at 187-188.)[7] Foster "was receiving ping information at the same time Agent McCarthy was tracking with the GPS." (*Id*. at 192.) Foster placed the longitude and latitude information from the phone tracking order "into Google and it generate[d] a map." (*Id*. at 192.) Foster relied on the ping information and the vehicle tracker to follow Defendants' vehicle from Las Vegas to Arizona. (*Id*. at 192-193.) Foster used the ping information to confirm that the tracking of Defendants' vehicle was accurate. (*Id*. at 192-193.)

## B.   Michael Garland.

HSI Special Agent Mike Garland was assigned to surveil Defendants when they arrived in Los Angeles and rented a vehicle. (Doc. 73 at 25.) On July 5, 2017, Agent Garland followed Defendants from Los Angeles International Airport to a hotel in Santa Monica, California. (*Id*. at 64-66.) Agent Garland was told by Agent Foster that a judge authorized a tracking device on that date (July 5, 2017), and Agent Garland placed

---

[5] During cross-examination, Agent Foster agreed that he testified on March 8 that that he "only" communicated with Officer Callister "through a text message string." (Doc. 86 at 23.) Agent Foster later testified that was incorrect, and stated that he "absolutely" spoke with Callister regarding the facts of the investigation. (*Id*. at 24.)

[6] The Court notes that the information regarding the cell phone tracking was not contained in the government's briefing. (Doc. 86 at 27, 32.) The parties referred to the warrant as a "ping order." (*Id*. at 35.) Defendants agreed the government disclosed the cell phone tracking order in Exhibit 24. (*Id*. at 29.) The Court allowed testimony and permitted cross-examination regarding the tracking order. Defendants stated they did not request a continuance and were prepared to proceed with cross-examination. (*Id*. at 185.)

[7] The hour references in the documents refer to Greenwich Mean Time.

the tracker on Defendants' Vehicle that evening. (*Id.* at 63, 66.) On July 6, 2017, Agent Garland met with Judge Torribio, who signed the written search warrant documents. Agent Garland testified that the written dates on the search warrant (Exhibit 8) are incorrect. (*Id.* at 69-70.) During cross-examination, Agent Garland agreed that California state warrants did not permit tracking outside of California. (*Id.* at 81.) On re-direct examination, Agent Garland testified that the affidavit to the tracking warrant requested permission to track Defendants' Vehicle outside of California. (*Id.* at 84.)

### C.    Shaun Helt.

On July 5, 2017, Agent Foster called HSI Special Agent Shaun Helt for assistance obtaining a drug detection dog. (*Id.* at 92.) Agent Foster told Agent Helt they had a tracking device on a vehicle that was potentially smuggling illegal drugs. (*Id.*) Agent Helt called Officer Callister to locate an available canine unit. (*Id.* at 93.) Agent Helt told Officer Callister that there was no probable cause for stop or search of the vehicle, and that Officer Callister would need to develop his own justification to stop or search the vehicle. (*Id.* at 93, 104, 111.)

Based on information from other agents, Agent Helt drove on I-15 to search for Defendants' Vehicle. (*Id.* at 94-95.) He saw the minivan as it drove into Arizona and he began to follow it from his unmarked car. (*Id.* at 95.) He followed Defendants' Vehicle until Officer Callister pulled out from a median and began following the vehicle. (*Id.* at 96.) Agent Helt slowed down to allow Officer Callister to follow Defendants' Vehicle and Agent Helt did not observe the vehicle commit a traffic violation. (*Id.*) Agent Helt did not see "that the vehicle had done anything erratic like switch lanes suddenly or slowed down or speed up suddenly." (*Id.* at 114.) Agent Helt did not remember seeing a semi-truck but "wouldn't have noticed" a "regular traffic violation." (*Id* at 117-118.) Agent Helt saw the traffic stop and stopped his vehicle a quarter of a mile behind Defendants' Vehicle. (*Id.*) He saw Defendant Gagnon exit the minivan and saw she was "very agitated" during the traffic stop. (*Id.* at 98.) Agent Helt did not see Defendants' arrest or the search of the vehicle. (*Id.* at 110.)

**D.      Brian McCarthy.**

HSI Agent Brian McCarthy assisted Agent Foster with the investigation. (*Id.* at 45.) He was not responsible for monitoring results from the cell phone tracking order, but he was aware of the order and discussed the results with Agent Foster. (Doc. 86 at 56.)

**E.      DPS Officer Tom Callister.**

Arizona Department of Public Safety ("DPS") Officer Tom Callister has conducted approximately 10,000 traffic stops in his career and has had training in narcotics detection. (*Id.* at 60-61.) On July 7, 2017, Officer Callister received a call from Agent Helt who told him agents were following a vehicle as a part of a drug trafficking investigation. (*Id.* at 62-63.) Officer Callister was told the vehicle "was related to another traffic stop on Interstate 40 that resulted in a drug seizure, specifically cocaine." (*Id.* at 63.) Officer Callister received several calls from others in the investigation and updates regarding the location of Defendants' Vehicle. (*Id.* at 64-66, 109-111.) Callister was told to "develop [his] own probable cause" (*id.* at 101) and stated it was "[his] investigation" (*id.* at 122). Officer Callister told agents "it would take about 10 to 15 minutes to develop any sort of indicators," during a traffic stop, of drug-related activity. (*Id.* at 67.) Officer Callister texted that "I'm going to make a stop somewhere between milepost 4 and 6 and it will take me about 15 – 10 to 15 minutes to develop reasonable suspicion to get in the vehicle." (*Id.* at 91.) Officer Callister testified that if there were "no indicators of criminal drug-related activity" then "there would be no way for me to get in that vehicle and I would have sent them down the road." (*Id.* at 92.)

On July 7, 2017, at approximately 6:45 p.m., Officer Callister saw Defendants' Vehicle pass his location and he testified he "immediately noticed that it was following a tractor trailer and was following it at an unsafe following distance that [he] estimated to be about one and-a-half car lengths." (*Id.* at 67.) When Officer Callister was approaching Defendants' Vehicle, he testified he saw Defendants' Vehicle pass a semi-truck and then "made an unsafe lane change back in front of the semi-truck of approximately one-half of

a car length." (*Id*. at 67.) Officer Callister saw the "taillight of the semi-truck [come] on and it appeared that the driver was trying to create distance between the vehicles." (*Id*. at 67-68, 113-116.) Officer Callister texted agents that "I'm behind him now. Here's where the fun begins, boys." (*Id*. at 69.)

Officer Callister stopped Defendants' Vehicle and spoke with Defendants in English. (*Id*. at 71, 120.) Defendant Takatsy was the driver and he appeared "very nervous." (*Id*.) Defendant Gagnon "appeared to be very nervous and [he] could see her heartbeat vigorously pulsing on her chest." (*Id*.) Takatsy first stated he left his license at the rental agency (*id*. at 146), but subsequently produced an expired Canadian driver's license (*id*. at 72). Officer Callister directed him to sit in the front seat of the patrol car. (*Id*. at 72.) Takatsy told Officer Callister that the Defendants were "traveling to Colorado" and he did not have specific plans in Colorado. (*Id*. at 73.) Officer Callister was given the rental record and it showed the vehicle was being driven to Plattsburgh, New York on a one-way rental for a cost of $2,190. (*Id*.) Officer Callister stated that, in his experience, drug couriers often use one-way rental vehicles. (*Id*. at 74.) Takatsy became more nervous as the traffic stop progressed. (*Id*. at 147.)

Officer Callister then spoke to Gagnon who stated that they were driving "to see the road itself." (*Id*. at 76.) Officer Callister testified that Defendants' statements that they were "going to Colorado and no destination, no plan, nothing to see, just the road itself" was "absolutely 100 percent an indicator that I have seen many, many times when I have gotten contraband out of other vehicles." (*Id*. at 126.) Officer Callister stated that when he informed Defendant Gagnon that Takatsy could no longer drive the vehicle, Gagnon had a "meltdown" and began "vigorously" texting and reaching under her seat. (*Id*. at 78.) Officer Callister instructed Gagnon to stop reaching under the seat, and she initially complied. (*Id*. at 79.) Once Officer Callister returned to his patrol car, he saw that Gagnon resumed reaching under her seat, so Officer Callister returned to the vehicle and told her to stop. (*Id*. at 80.) Officer Callister testified that Gagnon acted very nervously and continued to reach under her seat. (*Id*.) At that point, Officer Callister ordered

Gagnon out of the vehicle, and she complied. (*Id*. at 81.) Officer Callister returned to his patrol car, gave Takatsy a written warning and citation, and completed the traffic offense part of the vehicle stop. (*Id*. at 82, 127-128.) Officer Callister asked Takatsy for permission to search Defendants' Vehicle, and Takatsy declined. (*Id.* at 83.) Officer Callister decided to prolong the stop to "call for a drug dog." (*Id*.)

Officer Callister exited his patrol car, and walked over next to Defendants' Vehicle near Gagnon where he intended to call for a drug dog. (*Id.*) At that point, Gagnon asked Officer Callister if she could take anxiety medication that was located in her purse. (*Id*.) Officer Callister instructed Deputy Felish to retrieve the medication. (*Id.* at 84.) Deputy Felish did so, removing "a blister pack with the foil and the plastic" from Gagnon's purse and handing it to her, and Gagnon took one of the pills from the pack. (*Id*.) Officer Callister then asked Gagnon if she had a prescription for the medication and Gagnon stated that she had a prescription but did not have it with her. (*Id*.) Officer Callister told Gagnon "that the prescriptions were, in fact, illegal if she didn't have a prescription, and [he] was going to search her car." (*Id.*)[8] Officer Callister testified that Gagnon became defiant (*id*. at 141) and began yelling (*id*. at 135). Officer Callister stated that Gagnon "aggressively, assaultively" moved toward him, so she was placed in handcuffs. (*Id*. at 85.) Officer Callister then began a search of the vehicle for "any drugs that could possibly be in the vehicle, especially anti-anxiety medication." (*Id*.)

Officer Callister stated he was searching for evidence related to possession of prescription drugs and "illegal drugs." (*Id*. at 134.) When asked about probable cause to search for illegal drugs, Officer Callister stated that there "was an entire traffic stop prior to this with multiple indicators to show that these people were, in fact, involved in a criminal drug organization." (*Id*. at 134.) Mohave Sheriff's Deputy Felish, assisting with the search, opened the back of Defendants' Vehicle and found duffle bags containing

---

[8] Officer Callister testified that a proof of a prescription must accompany possession of prescription drugs, and the failure to have proof of a prescription was "a violation of law." (*Id*. at 95-96, 106-108, 133-134.) Deputy Felish testified similarly. (*Id*. at 164, 166, 168-172.)

black-plastic bricks of cocaine. (*Id*. at 85-86.)

### F.    Mohave Sheriff's Deputy Jeremy Felish.

Mohave County Sheriff's Deputy Jeremy Felish watched Officer Callister's interaction with Defendants during the traffic stop. (*Id*. at 158.) Deputy Felish testified that he could not hear the conversations between them, but saw that Gagnon was "very angry" and "yelling" at Officer Callister. (*Id*. at 158.) When Deputy Felish spoke with Gagnon she "would not make eye contact" with him and would not stand still when asked to stop pacing. (*Id*. at 160.) Deputy Felish found that her behavior was "beyond normal nervousness" expected of the general public during a traffic stop. (*Id*.) Based upon Gagnon's request to take anti-anxiety medication, Deputy Felish allowed her to retrieve a foil packet from her purse and consume a pill. (*Id*. at 163.) Gagnon told him that she had a prescription but did not have proof of the prescription with her. (*Id*. at 164.)

## III.    Conclusions of Law.

Agents were tracking Defendants based upon a California tracking device warrant and an Arizona phone tracking warrant. Both warrants were supported by probable cause and any state-law violations do not warrant suppression in this federal case. Based upon the collective knowledge doctrine, Officer Callister had probable cause to search Defendants' Vehicle.[9]

### A.    Tracking Device and Phone Warrants.

Defendants argue "there was no probable cause for the tracking warrant" (doc. 43 at 7-9) and that the California warrant did not permit tracking of the vehicle outside of California (*id*. at 10-14). Defendants request that "all evidence obtained as a result" of the California tracking warrant be suppressed. Defendants also argue that tracking information from the Takatsy phone warrant should also be suppressed because there was

---

[9] The Court's finding that Officer Callister had probable cause to search Defendants' Vehicle under the collective knowledge doctrine is dispositive as to the outcome of Defendants' Motion to Suppress. Accordingly, the Court need not address the remaining issues raised in the briefing and at the hearing – including the validity of the initial stop, whether Officer Callister developed independent probable cause to search, and whether Defendant Gagnon's possession of prescription medication was lawful.

no probable cause for that warrant and the tracking violated Arizona law. (Doc. 85 at 2.)

### 1.    Probable Cause.

Defendants first argue that probable cause did not exist for the issuance of the tracking device warrant[10] (doc. 43 at 7-9) and cell phone tracking warrant (doc. 85 at 4-5). The Court finds that both warrants were supported by probable cause. Probable cause exists if there is a "fair probability that contraband or evidence of a crime will be found in a particular place," under the totality of the circumstances. *United States v. Rodriguez*, 869 F.2d 479, 484 (9th Cir. 1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause, we have often told litigants, is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014) (citations and quotation omitted). This Court interprets an affidavit in a "commonsense manner," pays "great deference" to a judge's finding of probable cause, and determines whether there was a "substantial basis" for a probable cause finding.[11] Whether a search warrant is supported by probable cause must be determined from the "four corners" of the affidavit. *United States v. Luong*, 470 F.3d 898, 904-05 (9th Cir. 2006).

Here, both warrants contained the same facts that established probable cause. Both warrants assert that Bannon and Takatsy flew from Montreal, Canada to Los Angeles, California together prior to driving together to Las Vegas, Nevada on February 5, 2017. (Doc. 50-1 at 35.)[12] Bannon rented a Dodge minivan[13] and used Takatsy's phone number

---

[10] The installation of a tracking device on Defendants' Vehicle was a search requiring a court-authorized warrant. *See United States v. Jones*, 565 U.S. 400, 404 (2012) (holding that "installation of a GPS device on a target's vehicle and its use of that device to monitor the vehicle's movements, constitutes a 'search.'").

[11] *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011) ("we have reiterated the Supreme Court's directive that a magistrate's determination of probable cause should be paid great deference by reviewing courts"); *United States v. Flores*, 802 F.3d 1028, 2043 (9th Cir. 2015) ("We will not find a search warrant invalid so long as the issuing judge had a substantial basis for concluding that the supporting affidavit established probable cause.").

[12] The probable cause statement in the Arizona phone tracking warrant is contained in Exhibit 24 in pages 3-6 of the affidavit.

as the contact number.[14] The minivan was set for a one-way rental to "upstate New York near the Canadian border." (*Id.*) Both men checked into the Wynn hotel, and Takatsy's credit card was used for the rental of Bannon's room through February 7, 2017. (*Id.*) On February 7, 2017, Bannon drove from Las Vegas to Arizona in the minivan. (*Id.*) Bannon, driving alone, was stopped heading eastbound on Interstate 40 in Apache County, Arizona. Bannon's minivan contained 92 kilograms of cocaine and 2 kilograms of heroin. (*Id.*) Takatsy flew back to Montreal, Canada on February 8, 2017. (*Id.*)

On May 27, 2017, Takatsy and Gagnon flew from Quebec, Canada, to Las Vegas, Nevada. (*Id.* at 36.) Gagnon rented a Dodge minivan for a one-way trip to upstate New York to "the same destination location for rental vehicle from the seizure and arrest of Bannon." (*Id.*) On May 31, 2017, Gagnon flew back to Canada. (*Id.*) On June 4, 2017, Takatsy purchased a return ticket to Montreal, returned the minivan to the rental agency in Las Vegas, and flew back to Canada.

On July 5, 2017, Takatsy and Gagnon flew from Montreal, Canada to Los Angeles, California. Defendants rented a Chrysler minivan that was also scheduled as a one-way rental to upstate New York. (*Id.* at 36.)

The information in the probable cause statements established a fair probability to believe Takatsy returned to the United States on July 5, 2017 to engage in the transportation of illegal drugs. In February 2017, Takatsy flew to Los Angeles with Bannon. Takatsy was closely connected to the rental of a minivan that was destined for a one-way trip to upstate New York. Takatsy traveled with Bannon to Las Vegas, Nevada. Takatsy rented a room for Bannon. Takatsy and Bannon stayed in Las Vegas before

---

[13] Agent Foster testified that a "minivan is often used because it has a different look in the sense of families usually rent minivans based on space, and it's the normal traveling public would ignore a van. We think that vans are used by drug-trafficking organizations to throw off interdictors based on the association to families and based on the available cargo space within the vehicle." (Doc. 73 at 28.)

[14] The probable cause statements assert that Takatsy's credit card was used for the rental, but Agent Foster testified that was incorrect and instead Takatsy's phone number was used in the rental. (Doc. 73 at 34.)

Bannon was stopped in the minivan. Judges Torribio and Hatch knew that the February 2017 was *in fact* a cocaine trafficking trip, with a likely destination of upstate New York and ultimately Canada. Takatsy was closely connected to that trip. In May 2017, Takatsy returned to Las Vegas and was closely connected to the one-way rental of a minivan with the same destination as Bannon's trip. When Takatsy returned to Los Angeles in July and again rented a minivan with a one-way destination of upstate New York, Judges Torribio and Hatch had a substantial basis to believe Takatsy returned to his previous drug trafficking pattern. *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) ("With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity."); *United States v. Rivera-Pagan*, 283 Fed. App'x. 54, 56 (3d Cir. 2008) (finding substantial basis for probable cause that included information from the "same modus operandi [that] led to the successful seizure of 25 kilograms of cocaine and arrest of the courier").

### 2.    State Law Violations.

Violations of state law in the acquisition or execution of a search warrant do not justify suppression in this federal case. Defendants argue that the telephonic authorization of the California warrant was not recorded. They argue that California and Arizona law prohibit interstate tracking of a vehicle. But violations of state law do not warrant suppression under the Fourth Amendment. *See United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000) ("The general rule, therefore, is that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law."); *Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law"); *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1372 (9th Cir. 1987) ("We have consistently held that evidence obtained by federal officials acting in concert with state officials in violation of state law but in compliance with federal law is admissible in federal court."); *United States v. Bon*, 669 Fed. App'x. 411, 413 (9th Cir. 2016) ("California's recording requirement for telephonic warrant applications has no

federal constitutional counterpart. Accordingly, failure to comply with California's recording requirement does not require suppression.").[15]

### B.    Collective Knowledge to Stop and Search Defendants' Vehicle.

The stop of Defendants' Vehicle was justified by the collective knowledge doctrine. Law enforcement, collectively, had probable cause to believe that Defendants' Vehicle may have been involved in drug trafficking. Consequently, Officer Callister's stop and search of Defendants' Vehicle did not violate the Fourth Amendment.

> The collective knowledge doctrine allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest. It generally applies in two situations. The first is "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007). The second occurs "where an officer . . . with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion . . . directs or requests that another officer . . . conduct a stop, search or arrest." *Id*. at 1033. In both situations, collective knowledge may be imputed only if there has been some "communication among agents." *Id*. at 1032.

*United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010).

Under the collective knowledge doctrine, it is well settled that where one officer knows facts constituting reasonable suspicion or probable cause, and communicates an appropriate request to another otherwise uninformed officer, the uninformed officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment. *Ramirez*, 473 F.3d at 1037. To constitute "an appropriate request," a communication need not contain a summary of the underlying facts that give rise to the reasonable suspicion or probable cause. *Id.* at 1034-35 ("[T]he collective knowledge doctrine applies 'although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop,' and [] an officer may act "based in part on information or directions from other law enforcement officials." (quoting *United States v. Sutton*, 794 F.2d 1415, 1425 (9th Cir. 1986)).

---

[15] As such, the Court declines to consider the government's good faith argument. *See United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (finding the good faith exception to the exclusionary rules applies where "reliance on the search warrant" was based on that affidavit "was objectively reasonable").

Nor must "an appropriate request" include an affirmative direction to stop, seize, or search a suspect. *See United States v. Mayo*, 394 F.3d 1271, 1274 (9th Cir. 2005) (notifying another officer that he should "investigate suspicious narcotics activity" at a motel was sufficient to invoke collective knowledge doctrine); *United States v. Hensley*, 469 U.S. 221, 105 (1985) (holding that an officer's investigatory *Terry* stop of a suspect was valid based solely on another police department's "wanted flyer," which contained no facts supporting reasonable suspicion, because the officers who issued the flyer possessed probable cause to detain the suspect); *United States v. Lyons*, 687 F.3d 754, 760 (6th Cir. 2012) (finding a traffic stop valid under collective knowledge when State Troopers were made aware of the vehicle by DEA agents, but also directed to "develop independent probable cause for the stop, because the DEA did not want its lead targets tipped off that [the organization] was under federal investigation.").[16]

Defendants' argue that the collective knowledge doctrine does not apply to this case because Officer Callister was acting independently. (Doc. 74 at 1-4.) The Court disagrees. Here, agents and Officer Callister were working together regarding the stop of the Defendants' vehicle. Officer Callister spoke with agents, had some information regarding Defendant's suspected drug trafficking, and was coordinating with agents by text messaging regarding the time and location of the traffic stop.[17] Officer Callister was not required to know all of the information that was known to the agents. The doctrine does not require that Officer Callister receive explicit directions from the agents to search the vehicle. *See Mayo*, 394 F.3d at 1274; *Lyons*, 687 F.3d at 760. Officer Callister was justified in conducting a roadside search of the vehicle. *See United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) ("Under the automobile exception to the warrant

---

[16] The collective knowledge doctrine applies to both reasonable suspicion for traffic stop and probable cause to search vehicle. *See Ramirez*, 473 F.3d at 1032 (finding reasonable suspicion to stop vehicle under this doctrine); *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015) (finding that collective knowledge of officers justified probable cause search of vehicle).

[17] Officer Callister also observed Defendants' extreme nervous behavior and noted their suspicious description of driving to Colorado with no apparent destination.

requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime.").

## IV.    Recommendation.

Based on the foregoing and pursuant to 28 U.S.C. § 636(b), and L.R.Crim. 57.6(d)(1), Rules of Practice for the District of Arizona, the undersigned Magistrate Judge **RECOMMENDS** that the Honorable David G. Campbell, United States District Judge, after an independent review of the record, find Defendants' Motion to Suppress (doc. 43) be denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(b)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment.

**IT IS FURTHER ORDERED** the parties shall have 14 days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2). Failure to timely file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Judge without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Fed. R. Crim. P. 59.

Dated this 24th day of April, 2018.

_____
Honorable John Z. Boyle
United States Magistrate Judge

- 15 -