WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-17-08163-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Martin Takatsy (001)<br>Ariane Gagnon (002), | |
| Defendants. | |

Defendants Martin Takatsy and Ariane Gagnon are charged in a First Superseding Indictment with conspiracy and possession of cocaine with intent to distribute. Doc. 40. Defendants have moved to suppress the cocaine seized from their vehicle. Doc. 43. Magistrate Judge John Boyle held a two-day evidentiary hearing and issued a report and recommendation ("R&R") suggesting that the motion be denied. Doc. 87. Defendants filed objections, the government responded, and Defendants replied. Docs. 92, 93, 94. The Court will adopt Judge Boyle's recommendation and deny the motion to suppress. The request for oral argument is denied because the matter is fully briefed and supported by an extensive record, and oral argument will not aid the Court's decision.

## I. Legal Standard.

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" on a motion to suppress evidence in a criminal case. 28 U.S.C. § 636(b)(1). The Court must undertake de novo review of those

portions of the R&R to which specific objections are made. *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

**II.  Background.**

The R&R includes proposed findings of fact based on testimony and exhibits presented at the evidentiary hearing. Doc. 87 at 1-9. Defendants state that they dispute the proposed findings "as set forth herein" (Doc. 92 at 10), but make specific objections only to Judge Boyle's findings regarding testimony by Arizona Department of Public Safety Trooper Thomas Callister. Defendants assert that Trooper Callister generally was not credible, and they dispute his assertion that Defendants committed two traffic violations before being stopped and that Defendant Gagnon had a "meltdown" when she was arrested. Doc. 92 at 8. These factual findings are not significant to the Court's decision, and the Court will not adopt them. The Court otherwise accepts the findings of fact in the R&R and repeats some of them as background for this order. The Court has confirmed these facts by a review of the hearing transcripts and exhibits.

The Drug Enforcement Administration ("DEA") informed Homeland Security Investigations ("HSI") Senior Special Agent Chris Foster that 92 kilograms of cocaine and 2 kilograms of heroin were seized in February 2017 from a vehicle operated by Canadian national Ronald Bannon. Doc. 87 at 2, 11. This prompted Agent Foster to open an investigation into a suspected Canadian-based narcotics trafficking organization. *Id.* at 2.

Agent Foster learned that Bannon traveled with Defendant Martin Takatsy from Montreal, Canada, to Los Angeles, California, on February 3, 2017. *Id.* Bannon rented a minivan in Los Angeles, listing Takatsy's telephone as the contact number and setting a return destination of Plattsburg, New York, which is near the Canadian border. *Id.* The two men then traveled together to Las Vegas, Nevada, where Takatsy purchased a hotel room for Bannon. *Id.* Takatsy flew back to Canada from Las Vegas, and Bannon continued the drive east in the rented minivan. *Id.* Law enforcement stopped and

searched the vehicle in Arizona on February 7, 2017, and found the large quantities of cocaine and heroin. Doc. 73 at 15. These events led Agent Foster to suspect that Defendant Takatsy was Bannon's handler in the drug trafficking operation. *Id.*

On May 27, 2017, Defendants Takatsy and Gagnon travelled to Las Vegas from Canada. *Id.* Once there, Gagnon rented a minivan that was the same make and model as the minivan Bannon rented in February. *Id.* The rented minivan was also to be returned in Plattsburgh, New York. *Id.* On May 31, 2017, Gagnon flew back to Canada. *Id.* On June 4, 2017, Takatsy returned the van in Las Vegas and flew back to Canada. *Id.*

Takatsy and Gagnon traveled from Montreal to Los Angeles on July 5, 2017. Doc. 87 at 2. HSI Special Agent Mike Garland, who worked at Los Angeles International Airport ("LAX"), initiated surveillance of Defendants upon their arrival. *Id.* at 3. HSI agents observed Defendants rent a red Chrysler Pacifica minivan and travel to a hotel in Santa Monica, California. *Id.* at 2-4. The minivan, again, was to be returned in Plattsburgh, New York. *Id.* at 2. At approximately 8:00 p.m. on July 5, Agent Foster called a California state court judge, attested to a probable cause statement, and secured the judge's approval for a warrant to place a GPS tracking device on the minivan. Doc. 87 at 3-4. Agent Garland installed the device on the minivan. *Id.* at 4-5.

On the morning of July 6, Agent Garland presented a paper copy of the warrant application to the same California judge for signature. Doc. 87 at 5. The judge signed the warrant, but mistakenly dated it July 7 and noted that he had approved the warrant telephonically on the evening of July 6. Doc. 87 at 3 n.3.

On July 7, HSI agents used GPS tracking data to locate Defendants' vehicle as it traveled east on Interstate 15 ("I-15") from Las Vegas. *Id.* at 3. Anticipating that the vehicle would travel through Arizona on I-15, HSI agents contacted Trooper Callister to assist with a possible traffic stop of the vehicle. *Id.* HSI agents told Trooper Callister the vehicle was connected to a narcotics trafficking organization, but that he would need to develop his own reasonable suspicion to stop the vehicle and probable cause to search it. *Id.* at 4, 6.

Trooper Callister positioned himself on the median of I-15 to wait for Defendants' vehicle. Doc. 86 at 67. After it passed, he witnessed two alleged traffic violations: following a semi-truck at an unsafe distance and an unsafe lane change. Doc. 87 at 6-7. Trooper Callister initiated a traffic stop. *Id.* at 7. His initial conversation with Defendants revealed that Takatsy was driving without a valid driver's license; the vehicle was a one-way rental to Plattsburg, New York; and the cost of the rental was $2,190. *Id.* at 7. Trooper Callister also observed that Defendants were exceptionally nervous, Gagnon was non-compliant, and neither Defendant could describe their travel plans with specificity. *Id.* at 7-8.

Trooper Callister brought Takatsy back to his vehicle and issued him a written warning and citation. *Id.* at 8. Trooper Callister asked for consent to search the minivan, Takatsy declined, and Callister detained him to wait for a narcotics-detection canine. *Id.*

Trooper Callister returned to the minivan to speak with Gagnon, who explained that she would like to take her anti-anxiety medication. *Id.* Trooper Callister gave her permission, and she retrieved a single pill from a foil packet. *Id.* After she ingested it, Trooper Callister asked her if she had a prescription for the drug. *Id.* She said she did, but claimed she did not possess it at that time. *Id.* Trooper Callister arrested her for possessing a prescription drug without a prescription. *Id.* He then searched the vehicle for illegal drugs and discovered cocaine in duffel bags. *Id.* at 8-9.[1]

---

[1] As part of this investigation, agents also obtained an Arizona warrant to access cell-site location information associated with Takatsy's cell phone. Doc. 86 at 26-28. The R&R concludes that the warrant was supported by probable cause and that alleged state-law violations are immaterial to the Fourth Amendment inquiry. Doc. 87 at 9-13. Defendants' objection to the R&R asserts in passing that the warrant was not supported by probable cause and violated state law (Doc. 92 at 5-6), but does not make any specific objections or arguments with respect to it.

In a supplemental brief, Defendants contend that *Carpenter v. United States*, 585 U.S. --- (2018), invalidates the cell-site order. Doc. 95. *Carpenter* held that accessing seven days of historical cell-site location information constituted a search requiring a warrant based on probable cause. But the order in this case was based on probable cause (Doc. 95-1 at 3), and Defendants concede that "[t]here is no claim by the government that it relied on the cell site information to find and stop the defendants" (Doc. 95 at 2).

**III. Discussion.**

Much of Defendants' 42-page submission reargues the merits of the motion to suppress. *See* Doc. 92. As discussed above, the Court will consider only Defendants' specific objections to the R&R.[2]

**A. California Tracking Warrant.**

Defendants move to suppress the physical evidence on the ground that the California tracking warrant, which was used to locate Defendants' vehicle, violated the Fourth Amendment. Doc. 87 at 9-13. Defendants argue that the warrant was not supported by probable cause and was issued and executed in violation of California law. *Id.* The R&R concludes that the warrant was supported by probable cause and that alleged state-law violations are immaterial to the Fourth Amendment inquiry. *Id.*

**1. Probable Cause.**

In assessing the existence of probable cause, "[t]he task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he duty of a reviewing court is simply to ensure that the [judge] had a 'substantial basis for concluding' that probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960) (ellipses and brackets omitted)). The Court must remember that a "fair probability" does not amount to "certainty or even a preponderance of the evidence," and must not "flyspeck" the warrant affidavit through de novo review. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc). The issuing judge's determination "should be paid great deference[.]" *Gates*, 462 U.S. at 236.

The R&R concludes that the following facts combined to establish probable cause for the tracking warrant: (1) Takatsy and Bannon traveled together from Montreal to

---

[2] The Court's local rules require that an objection to an R&R be no longer than 10 pages "[u]nless otherwise permitted by the Court." LRCiv 7.2(e)(3); LRCrim 12.1(c). Defendant Takatsy did not seek leave to file a 42-page brief. The Court has considered the entire brief, but defense counsel should pay closer attention to the Court's rules.

Los Angeles in February 2017; (2) Bannon rented a Dodge minivan, listing Takatsy's telephone as the point of contact; (3) the minivan was a one-way rental to be returned near the Canadian border in Plattsburg, New York; (4) the two traveled to Las Vegas, Nevada, where Takatsy purchased a hotel room for Bannon; (5) Bannon continued the trip alone and was stopped in Arizona with 92 kilograms of cocaine and 2 kilograms of heroin in the minivan; (6) Defendants used a similar travel pattern in May 2017, flying from Canada to Las Vegas and renting a one-way Dodge minivan to Plattsburg; and (7) Defendants flew from Montreal to Los Angeles on July 5 and rented a one-way minivan to be returned in Plattsburg. *Id.* at 10-11. The R&R concludes that this information "established a fair probability to believe Takatsy returned to the United States on July 5, 2017 to engage in the transportation of illegal drugs." *Id.* at 11-12.

Defendants argue that the R&R erroneously associates Takatsy with Bannon. Doc. 92 at 17. Defendants argue that the R&R should have disregarded testimony, unsupported by documentary evidence, that Bannon and Takatsy were seen together at LAX, that Bannon listed Takatsy's telephone as the point of contact on the rental agreement, and that Takatsy purchased a hotel room for Bannon in Las Vegas. *Id.* Although the government did not present documentary evidence to support these facts, it did present sworn testimony. Moreover, travel records placed in evidence confirm that Takatsy and Bannon traveled together not only on the same flight from Canada to Los Angeles, but also on the same reservation. *See* Doc. 50-1 at 2-4. Although the DEA mistakenly believed that Takatsy rented Bannon's minivan (Doc. 50 at 9), Defendants do not show how this error undermines the other reasons to suspect an association between Takatsy and Bannon – they travelled together from Canada, rented a van at LAX, and drove together to Las Vegas. That is not the conduct of strangers. The Court concludes that the evidence presented to the California judge established a substantial basis to conclude that Takatsy had a connection to Bannon, who a short time later was found to be transporting a large quantity of drugs in the minivan the two had taken to Las Vegas.

Defendants fault the R&R for not considering the "failure of the government to investigate the background of [Defendants] in Canada or the [United States] including their criminal history, jobs, or relationships." Doc. 92 at 17. But Defendants cite no authority for the proposition that the government must complete a comprehensive investigation before seeking a warrant. *Id.* at 17-18. "Once probable cause is established, 'an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.'" *Cameron v. Craig*, 713 F.3d 1012, 1019 (9th Cir. 2013) (quoting *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003)). Given the joint activities of Takatsy and Bannon, the fact that Bannon was caught transporting a large quantity of drugs, and the fact that Takatsy and Gagnon later followed a pattern of behavior very similar to the activities of Takatsy and Bannon, the R&R rightly concludes that probable cause existed to believe that Takatsy and Gagnon were engaged in drug transportation, even without further background checks.

Defendants contend that the warrant was unsupported by probable cause because "there is no claim . . . that these defendants were going to transport drugs and no substantial probability that drugs would be in the car in the future." Doc. 92 at 22. The Court does not agree. Takatsy and Gagnon followed essentially the same pattern of conduct as Takatsy and Bannon – they flew together from Canada to Los Angeles, rented a minivan, and arranged for the minivan to be returned in Plattsburg, New York. Because this same conduct previously had resulted in the transportation of almost 100 kilograms of illegal drugs, the repeat activities established a "fair probability" that narcotics were again to be transported. *Gates*, 462 U.S. at 238. The warrant application clearly articulated these facts in the probable cause section (Doc. 50-1 at 35-36), and Agent Foster read this section to the judge word-for-word in obtaining the tracking warrant (Doc. 73 at 33; Doc. 86 at 8). The Court cannot conclude that the state court judge erred in finding probable cause to support the tracking warrant.[3]

---

[3] Defendants' reliance on *Giordenello v. United States*, 357 U.S. 480 (1958), is not persuasive. Doc. 92 at 17. That case invalidated a warrant issued upon a law enforcement officer's conclusory statement that a crime had been committed and

## 2. **Telephonic Authorization and Particularity.**

Defendants contend that the R&R should have addressed whether the telephonic authorization on July 5 constituted the issuance of a warrant. Doc. 92 at 23. Defendants also argue that installation of the tracker before a hard copy of the warrant was signed violated the Fourth Amendment. *Id.* Defendants cite one case – *United States v. Evans*, 469 F. Supp. 2d 893 (D. Mont. 2007) – in support of this argument. *Evans* considered a motion to suppress physical evidence gathered pursuant to an unsigned warrant. When a federal agent visited a magistrate judge's chambers, the judge signed the warrant application but not the warrant itself. *Id.* at 895. *Evans* reasoned that the Fourth Amendment does not require a signature, but does require "some indication that the search is officially authorized." *Id.* at 897. In the absence of any clear indication that the magistrate judge intended to authorize the warrant, the district court declined to speculate and rejected the government's argument that the warrant had been authorized. *Id.* at 899. This case is different. The California judge did more than listen to and acknowledge a statement of probable cause. He actually approved the warrant over the telephone, as evidenced by his handwritten note the next morning: "at 8 p.m. I placed Agent Garland under oath. He explained the facts & I approved the warrant." Doc. 50-1 at 33.[4]

Defendants argue that the telephone authorization cannot meet the particularity requirement of the Fourth Amendment. Doc. 92 at 23-25. They assert that the "warrant in this case was required to name the place to be searched, the car, and the thing to be seized, vehicle location information in the state of California." *Id.* at 24-25.

---

"material witnesses [existed] in relation to th[at] charge." *Id.* at 481. The warrant application in this case includes two pages of detailed facts. Doc. 50-1 at 35-36.

[4] Defendants note that Agent Foster was the one who called the judge, not Agent Garland, and assert that this error in the judge's handwritten note shows that he was confused. *See* Doc. 92 at 19. It is not disputed, however, that Agent Garland, who was based in California (Agent Foster was in Arizona (Doc. 73 at 32)), was the one who physically presented the warrant application to the judge the next day. It appears that the judge simply wrote the name of the agent standing before him on July 6. The Court cannot conclude that this error somehow eliminates probable cause.

- 8 -

With respect to the place to be searched, the Ninth Circuit has explained:

> We have held that the test for determining the validity of a warrant is (1) whether the warrant describes the place to be searched with sufficient particularity to enable law enforcement officers to locate and identify the premises with reasonable effort, and (2) whether any reasonable probability exists that the officers may mistakenly search another premise. . . . [W]e have also recognized that the necessary specificity of the description . . . depends heavily upon the factual circumstances of each case. Additionally, we have also taken into account the knowledge of the officer executing the warrant.

*United States v. Brobst*, 558 F.3d 982, 991-92 (9th Cir. 2009) (internal quotation marks and citations omitted).

The Court concludes that the telephonic approval of the tracking warrant sufficiently identified the thing to be searched and the nature of the search. HSI agents observed Defendants rent a particular minivan at LAX and drive it to a hotel in Santa Monica. Agent Foster drafted a probable cause statement, called the state court judge, and read the probable cause statement to the judge over the telephone, word-for-word, after being placed under oath. Doc. 73 at 31-33; Doc. 86 at 8; Doc. 50-1 at 33.[5] The probable cause statement precisely identified the vehicle to which the tracking device would be attached: "a red in color 2017 model year Chrysler Pacifica bearing California license plate 7XIB716." Doc. 50-1 at 36. The judge authorized agents to place a tracking device on that vehicle. *Id.* at 33, 41; Doc. 73 at 36. On these facts, the Court concludes that the telephone approval "enable[d] law enforcement officers to locate and identify [the minivan] with reasonable effort," and that there was no "reasonable probability . . . that the officers [would] mistakenly search another [vehicle]." *Brobst*, 558 F.3d at 992.[6]

---

[5] Defendants appear to agree that Agent Foster read the probable cause statement to the judge. Doc. 92 at 1, 5.

[6] Defendants assert in passing that the judge was read only the probable cause statement during the July 5 phone conversation and was not read other parts of the warrant application. Doc. 92 at 19. Defendants imply that the judge did not know what he was authorizing. But the next morning, when the judge signed the warrant that

The Court also concludes that the telephonic approval of the tracking warrant sufficiently identified the things to be seized. The warrant "must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized. The purpose of the breadth requirement is to limit the scope of the warrant by the probable cause on which the warrant is based." *United States v. Fries*, 781 F.3d 1137, 1151 (9th Cir. 2015) (citation omitted). The warrant approved seizure of the "current and past locations" of the minivan utilizing the GPS tracking device, and the judge's handwritten note on the warrant confirms that he approved it telephonically. Doc. 50-1 at 33, 41. On these facts, the Court concludes that the telephone approval was "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *Fries*, 781 F.3d at 1151.

Defendants' reliance on *Groh v. Ramirez*, 540 U.S. 551 (2004), does not require a different result. *Id.* at 557-58 (warrant identified the house to be searched, but totally failed to identify items to be seized).[7]

---

specifically authorized placement of a "tracking device" on a "2017 Red Chrysler Pacifica, CA-7XIB716," he noted by hand on the warrant that he "approved the warrant" by phone the previous evening. Doc. 50-1 at 33, 41.

[7] Defendants suggest briefly that the tracking warrant was issued in violation of California law because the telephone conversation with the judge was not recorded and the warrant authorized tracking outside of the state. Doc. 92 at 12. Judge Boyle specifically concluded, however, that state law violations do not require suppression in federal prosecutions, and cited many cases in support. Doc. 87 at 12-13. Defendants do not object to this conclusion and provide no basis for the Court to find it incorrect. Doc. 92 at 12. The Court has, nonetheless, reviewed the cases cited by Judge Boyle, and finds that they support his conclusion. *E.g.*, *Virginia v. Moore*, 553 U.S. 164, 173-74 (2008).

To the extent Defendants contend that the facial scope of the warrant was somehow limited by California law, and that tracking the vehicle was outside the scope of the warrant and therefore a violation of the Fourth Amendment (Doc. 92 at 26), the Court is not persuaded. To determine whether officers exceeded the scope of a search warrant, the district court must "examine the language of the search warrant and ask whether a reasonable officer would have interpreted the warrant to permit the search at issue." *United States v. Johnston*, 789 F.3d 934, 941 (9th Cir. 2015) (internal quotations and brackets omitted). The warrant application requested authority to track the minivan outside of California (Doc. 50-1 at 37-38), and the warrant broadly authorized the government "to monitor the whereabouts and movements of the target vehicle[] in any public or private place for 45 days" (*id.* at 41). The Court concludes that a reasonable officer would have interpreted the plain language of the warrant to permit tracking outside of California. *See Johnston*, 789 F.3d at 942 (considering the plain language of

## B. Vehicle Stop and Search.

Defendants move to suppress the physical evidence seized from the vehicle on the ground that the traffic stop and subsequent search each violated the Fourth Amendment. Doc. 43. Relying on the collective knowledge doctrine, the R&R concludes that law enforcement had probable cause to believe that the vehicle contained illegal drugs, thus permitting the stop and search. Doc. 87 at 13-15. Defendants object to this conclusion. Doc. 92 at 6-7, 26-27.

### 1. Collective Knowledge Doctrine.

Under the collective knowledge doctrine, a court looks to the collective knowledge of all the officers involved in the criminal investigation. The Ninth Circuit has explained:

> [This] doctrine allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest. It generally applies in two situations. The first is where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned. The second occurs where an officer with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion directs or requests that another officer conduct a stop, search or arrest. In both situations, collective knowledge may be imputed only if there has been some communication among agents.

*United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (internal quotation marks and citations omitted); *see also United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007).

Defendants contend that the collective knowledge doctrine does not apply in this case "because no matter how the facts are pieced together, the agents and Callister had no knowledge about whether drugs had ever been put in the car even though the car had been under physical or electronic surveillance the entire time." Doc. 92 at 32. As

---

the warrant). Even if the Court were to stretch this standard to conclude that a warrant's citation to a specific statute can be read as incorporating by reference some additional limit on the scope of the warrant, the warrant in this case specifically mentions only California Penal Code §§ 1524(a)(12) and 1534(b)(6), neither of which mentions a geographical limit on use of the tracking device. *See* Doc. 50-1 at 33, 41.

explained in this order, however, the objective facts created a fair probability that Defendants were transporting illegal drugs.

Defendants argue that the collective knowledge doctrine cannot apply because Agent Helt told Trooper Callister that the agents did not have probable cause to stop and search the vehicle. Doc. 92 at 26-27. Although Agent Helt apparently made this statement, he was not significantly involved in the investigation. Doc. 73 at 37-43. He was based in St. George, Utah, and was contacted to help locate a law enforcement officer in Arizona who could assist with a traffic stop. *Id.* Agent Foster, who was running the investigation, disagrees with Agent Helt's assertion that probable cause was lacking. *Id.* at 40-41. Agent Foster believes there was probable cause to stop the vehicle. *Id.* None of this really matters, however, because probable cause is determined on the basis of the objective evidence, not the officers' subjective belief. "The Supreme Court has made clear that an officer's subjective thoughts play no role in the Fourth Amendment analysis." *Ramirez*, 473 F.3d at 1030. "[A]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) (emphasis in original; internal quotation marks and brackets omitted).

Defendants contend that the collective knowledge doctrine does not apply because Callister viewed the stop as his own investigation. Doc. 92 at 27. Callister was not, Defendants argue, a member of the investigative team. *Id.* But the Ninth Circuit test requires only limited communication to "distinguish officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *Ramirez*, 473 F.3d at 1033 (internal quotation marks and brackets omitted). As explained below, the communication in this case was sufficient to satisfy this standard.

Defendants also argue that the collective knowledge doctrine does not apply because the HSI agents did not ask Callister to stop and search the car, only to locate it. Doc. 92 at 26-27. Although a request to make a stop often is part of the circumstances

that lead to application of the doctrine, the Ninth Circuit requires only that the HSI agents communicated with Callister before the stop. *Ramirez*, 473 F.3d at 1036-37. "In prior cases . . . we have been willing to aggregate the facts known to each of the officers involved at least when there has been communication among agents." *Id.* at 1032 (quotation marks and brackets omitted). "[T]he cases suggest a limited requirement that there be a communication but not necessarily the conveyance of any actual information among officers." *Id.* at 1032-33.

Here, Agent Foster conveyed a substantial amount of information to Callister:

> I called Callister and gave him a general underlining of the facts, which included the previous trip with Ronald Bannon and the facts underlining that, to include the car rental information, the seizures in Arizona and the travel pattern and relationship between Takatsy and Bannon. And then we were currently investigating another vehicle in control – that we believed to be in control of Martin Takatsy and Ariane Gagnon with a similar, if not exact, travel pattern as the February seizure.

Doc. 86 at 21-22; *see also* Doc. 86 at 24.[8]

In addition, Callister continued to communicate with HSI agents as he prepared to locate Defendants' vehicle and make a traffic stop. The record includes a string of texts from Callister to the agents. Doc. 81 at 2, Ex. 22.

These communications satisfy the Ninth Circuit's requirement for application of the collective knowledge doctrine. *See Villasenor*, 608 F.3d at 475; *Ramirez*, 473 F.3d at 1032-33.

### 2. The Traffic Stop and Search Were Valid.

Defendants argue that the traffic stop was not valid because no traffic violations occurred, and that Trooper Callister never developed sufficient suspicion to detain Takatsy or probable cause to arrest Gagnon or search the vehicle. Doc. 92 at 34-41.

---

[8] Agent Foster testified on the first day of the hearing that he communicated with Callister only by text, but corrected this testimony during the second day, stating that he misspoke on the first day. Doc. 86 at 23. Defendants argue that Trooper Callister's testimony was not credible (Doc. 92 at 8-9), but do not make similar arguments regarding Agent Foster's testimony.

These arguments are irrelevant, however, if the officers collectively had probable cause to stop and search the minivan.

In *Ramirez*, a sergeant with probable cause to believe the defendants were engaged in drug trafficking requested that a uniformed officer make a traffic stop on the vehicle defendants were driving. 473 F.3d at 1029. The officer made the stop after he observed the defendants straddling a lane line, and then arrested one of them for driving with a Mexican driver's license. *Id.* On appeal, defendants argued that no traffic violation occurred and that drivers in California can use Mexican driver's licenses. *Id.* at 1030. The Ninth Circuit found these arguments irrelevant because the sergeant had probable cause to stop the vehicle and the collective knowledge doctrine imputed that probable cause to the officer who made the traffic stop. *Id.* at 1036-37. The court of appeals explained: "it does not matter that Officer Hulben was directed to make a 'traffic stop,' nor does it matter whether he had valid grounds to make the traffic stop because of lane-straddling. If the officers had probable cause, then the seizure and search of the vehicle will be justified." *Id.* at 1031.[9]

Thus, if the HSI agents and Trooper Callister collectively had enough information to establish probable cause, the stop and search of Defendants' minivan did not violate the Fourth Amendment. "Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment." *Id.* at 1037.

Considering all of the facts known to the HSI agents and Trooper Callister, the Court concludes that probable cause existed to stop Defendants' vehicle. These facts include the following: (1) Takatsy and Bannon traveled together from Montreal to Los

---

[9] Defendants' reliance on the concurring opinion in *Ramirez* is misplaced. Doc. 92 at 28. The concurrence emphasized that agents cannot order a pretextual traffic stop when they lack probable cause. *Ramirez*, 473 F.3d at 1037 (Kozinski, J., concurring). Here, the agents had probable cause.

Angeles in February 2017, using the same reservation; (2) Bannon rented a Dodge minivan, listing Takatsy's telephone as the point of contact; (3) the minivan was a one-way rental to be returned near the Canadian border in Plattsburg, New York; (4) the two traveled to Las Vegas, Nevada, where Takatsy purchased a hotel room for Bannon; (5) Bannon continued the trip alone, in the rented minivan, and was stopped in Arizona carrying 92 kilograms of cocaine and 2 kilograms of heroin; (6) Takatsy engaged in similar conduct with Gagnon in May 2017 when they flew from Canada to Las Vegas and rented a one-way Dodge minivan to Plattsburg; (7) Takatsy did so again on July 5 when he and Gagnon flew from Montreal to Los Angeles and rented a one-way minivan to be returned in Plattsburg; (8) the two of them then drove to Las Vegas and spent time there; and (9) they continued their journey toward Arizona, as had Bannon when he was found carrying narcotics. These facts created a "fair probability" that Takatsy was transporting illegal narcotics with Gagnon. *Gates*, 462 U.S. at 238.

The Court also concludes that probable cause existed to search the minivan. In addition to the above facts, the following facts were developed during the stop and were collectively known: Takatsy and Gagnon were exceptionally nervous, Takatsy lied about possessing a valid driver's license, Takatsy was unable to describe specific plans for their trip, and Gagnon asserted that they traveled to the United States just to see the road itself. Facts collectively known by the HSI agents and Trooper Callister established probable cause to believe that the vehicle contained narcotics, and "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991); *see also Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("When there is probable cause to search for contraband in a car, it is reasonable for police officers . . . to examine packages and containers without a showing of individualized probable cause for each one."); *United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) ("Officers may conduct a warrantless search of an automobile, including containers within it, when they

have probable cause to believe that the vehicle contains contraband or evidence of criminal activity.").

IV. **Conclusion.**

After conducting a de novo review of the portions of the R&R to which Defendants have specifically objected, the Court accepts Judge Boyle's recommendation that the motion to suppress be denied.

**IT IS ORDERED** that the R&R (Doc. 87) is **accepted** and Defendants' motion to suppress (Doc. 43) is **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 1/4/2018.

Dated this 2nd day of July, 2018.

_David G. Campbell_
David G. Campbell
United States District Judge